**PANHANDLE EASTERN PIPE LINE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**
**(three cases).**

**Nos. 78–1356, 78–1630 and 78–1960.**

United States Court of Appeals, District of Columbia Circuit.

Argued 23 April 1979.

Decided 20 Dec. 1979.

Raymond N. Shibley, Washington, D. C., with whom Brian D. O'Neill, Washington, D. C., was on the brief, for petitioner.

Kristina Nygaard, Atty., Federal Energy Regulatory Commission, Washington, D. C., for respondent; Howard E. Shapiro, Sol., Federal Energy Regulatory Commission, Steven A. Taube and Barbara J. Weller, Attys., Federal Energy Regulatory Commission, Washington, D. C., were on the brief.

Before WRIGHT, Chief Judge, WILKEY, Circuit Judge and LARSON *, United States Senior District Judge for the District of Minnesota.

Opinion for the Court filed by Circuit Judge WILKEY.

Opinion concurring in part and dissenting in part filed by Chief Judge J. SKELLY WRIGHT.

WILKEY, Circuit Judge:

In these consolidated petitions, Panhandle Eastern Pipe Line Company (Panhandle) challenges orders issued by the Federal Energy Regulatory Commission (FERC). Two of these petitions[1] challenge FERC orders requiring Panhandle to flow through new transportation revenues to its resale gas customers via its unrecovered purchased gas account (PGA), while prohibiting the flow-through of new transportation costs. The third petition[2] challenges the Commission's selective waiver of its requirement of tracking authority allowing Panhandle to track decreased rates charged it by other pipelines, but not permitting it to pass on increased rates charged Panhandle. For the reasons to be discussed, we set aside the order in No. 78–1356, set aside in part and affirm in part the order in No. 78–1630, and affirm the order in No. 78–1960.

## I. BACKGROUND

Commencing around 1971 shortages developed in the supplies of natural gas available to interstate pipelines, resulting in curtailment of deliveries to their customers. As a consequence of the reduction in pipeline gas supplies, natural gas users, including pipelines such as Panhandle, have had to seek more distant supplies of natural gas, which in turn requires special transportation arrangements in order to bring those supplies into their systems. A second consequence of the shortage and resulting curtailment has been that pipelines have substantial excess capacity which could be used, *inter alia*, to transport natural gas for other pipeline users. The instant petitions involve attempts by Panhandle and the Commission to grapple with problems arising from these changed conditions.

### A. *No. 78–1356*

On 30 June 1977 Panhandle and its wholly owned subsidiary, Trunkline Gas Company, filed a joint application pursuant to section 7(c) of the Natural Gas Act[3] for a certificate of public convenience and necessity to transport up to 1,800 Mcf of natural gas on a firm basis and 1,200 Mcf on a best efforts basis for eventual redelivery to Libby-Owens-Ford Company (LOF). The term of the transportation agreement was eight years. The rate proposed by Panhandle and Trunkline for the transportation service was $7,650 per month, subject to adjustment.

The Commission issued its order granting the requested certificates of public convenience and necessity for the transportation services on 16 December 1977. The certificates were granted for a two-year period only.[4] The Commission approved Panhandle's and Trunkline's proposed transportation charges, after a minor adjustment.

In the same order, the Commission stated:

The rates in Docket No. RP 75–102 [Panhandle's 1975 rate case] provide for the recovery of all justifiable costs for gas to be sold or transported but do not include the transportation of gas as proposed herein. Since Panhandle will recover its

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. Nos. 78–1356 and 78–1960.

2. No. 78–1630.

3. 15 U.S.C. § 717f(c) (1976).

4. The two-year limitation placed on the transportation service at issue here apparently reflects a Commission policy with respect to the

transportation by jurisdictional pipelines of natural gas sold by certain producers from the onshore domain and the offshore nonfederal domain to nonresale industrial and commercial customers for high priority uses. *See* FPC Order No. 533, Docket No. RM75–25, *aff'd, American Pub. Gas Ass'n v. FERC*, 190 U.S.App.D.C. 192, 587 F.2d 1089 (D.C.Cir.1978).

costs through normal operations, any revenues from the instant transportation service shall be credited to its unrecovered purchased gas cost account.[5]

Thus in granting Panhandle's certificate to transport gas for LOF, FERC ordered the pipeline *to apply these transportation revenues to reduce the rates of gas resale customers by crediting the revenues to its PGA.*[6] This was designed to ensure that revenue gains of the transportation service would "inur[e] to the benefit of all of [Panhandle's] resale customers."[7]

On 13 January 1978 Panhandle requested a rehearing. It labeled the crediting requirement inappropriate because it was not limited to the excess of revenues over incurred costs. The company also argued that it was error to require crediting of transportation revenues to its purchased gas account because there is no relation between the two and "[t]he purchased gas account is carefully controlled under the Commission's PGA regulations, and should not be mixed up with transportation revenues." Further, there was no assurance the purchased gas adjustment tracking would be permitted throughout the eight-year period of the contract. Panhandle claimed the provision was discriminatory because it was not required of another pipeline, Transco, in the transportation arrangement. Finally the company urged that the requirement was arbitrary because it required automatic crediting of revenues without provision for automatic recovery of transportation costs.[8]

The Commission rejected Panhandle's arguments in its order on rehearing issued 22 February 1978. FERC explained that the transportation service was made possible because of unused capacity in Panhandle's system, and that the costs associated with that capacity were already borne by Panhandle's resale customers. Thus, crediting the revenues through Account 191 was designed to benefit the resale gas customers who had paid for the costs associated with the excess pipeline capacity. There was no need to consider whether the PGA clause would continue the eight years of the contract because the certificate was limited to two years only. FERC found no discrimination vis-a-vis Transco, because Transco had previously agreed to credit transportation revenues to its unrecovered purchased gas account, and treatment of the revenues was an issue in certain Transco rate proceedings. The Commission did amend its 16 December 1977 order to allow Panhandle to recover its out-of-pocket costs incurred in performing the transportation services.[9] Finally, the Commission pointed out that "[i]n the event Panhandle's other transportation costs [were] preventing it from earning a reasonable return, it [was] free at any time to submit a general rate change under Section 4(e) of the Natural Gas Act."[10]

On 20 April 1978 Panhandle filed its petition for review docketed as No. 78–1356.

B. *No. 78–1960*

On 25 October 1977 Trunkline applied for a certificate of public convenience and necessity to transport up to 10,000 Mcf of natural gas per day for Panhandle from offshore Louisiana. The gas was previously purchased by Panhandle from its affiliate Pan Eastern Exploration Company. The gas is transported by Trunkline to an exist-

5. *Panhandle E. Pipe Line Co.*, Docket No. CP77–479 (16 Dec. 1977), *modified* (22 Feb. 1978), *reprinted in* Joint Appendix (J.A.) at 50, 54.

6. The mode of operation of the purchased gas account (PGA) provisions is discussed at notes 69–72 and accompanying text p. —— of 198 U.S.App.D.C., p. 1134 of 613 F.2d *infra*.

7. J.A. at 57, *see id.* at 61.

8. *See* Application for Reconsideration and Rehearing, *reprinted in* J.A. at 69–71.

9. The amount to be credited to Account 191 each month, then, was the excess of revenues over jurisdictional out-of-pocket costs multiplied by the ratio of jurisdictional sales volume to total sales volumes for the month. *Panhandle E. Pipe Line Co.*, Docket No. CP77–479 (order on rehearing, 22 Feb. 1978), *reprinted in* J.A. at 68, 70.

10. *Id.* at 70.

ing interconnection with Panhandle near Tuscola, Illinois. Two other pipelines, Tarpon Transmission Co. and Tennessee Gas Pipeline Co., were also involved in the transportation arrangement. Panhandle was to pay $81,800 per month for the transportation service plus a proportionate share of Trunkline's payment to Tarpon for offshore transportation. Total cost to Panhandle for the new transportation service is claimed to be from $1.5 to $2 million per year.

Because the Commission had previously required Panhandle to credit new transportation revenues to its unrecovered purchased gas account, Panhandle petitioned to intervene in the proceeding and sought to have Trunkline's certificate conditioned so as to permit Panhandle's new transportation costs to be included as purchased gas costs recoverable through its PGA clause.[11]

On 17 April 1978 the Commission issued its order granting Trunkline's certificate and denying Panhandle's request.[12] The Commission explained that the crediting of transportation revenues was applied to short term transportation arrangements to "assure that the pipelines' customers share in the revenues received from such transportation service, since the rates that the customers pay are based on costs and revenues established in the pipelines' most recent approved rate case." The Commission then reasoned that recovery of transportation costs through the purchased gas adjustment provisions is not permitted unless the pipeline's tariff includes a "tracking" provision. Panhandle's tariff does not include such a provision. Because the Trunkline proceeding concerned a long term transportation service (ten years), the Commission determined that "if the cost to Panhandle for the transportation service performed by Trunkline precludes earning a reasonable return, Panhandle should consider submitting a general rate change filing under Section 4(e) of the Act." The

Commission further reasoned that since each Mcf of sales included fixed costs, to the extent Panhandle sold more gas than contemplated when the original rates were filed, the additional fixed costs recovered would offset the additional transportation costs.

Panhandle filed for rehearing on 16 May 1978.[13] In its application Panhandle strenuously objected to the crediting requirement previously imposed upon it in the LOF proceedings. The company argued that disallowing flow-through of costs in the Trunkline proceeding while requiring crediting of revenues in the LOF proceeding was inconsistent, and constituted a double penalty to Panhandle. It argued that the Commission's reliance on Panhandle's most recently approved rate case was misplaced, because it was "several years old and provide[d] no justification for the assumption that Panhandle's customers are paying for the costs presently being incurred." The company then requested a hearing to show that it was not recovering its costs of service and an adequate return. Panhandle argued that it was inconsistent for the Commission to require a "tracking" provision to pass on increased transportation costs, but not to pass on increased revenues. The company also objected to the requirement that it file a section 4 rate proceeding in order to recover its increased transportation costs, and cited two recent Commission cases where pipelines were allowed to track incremental costs without filing a section 4 rate increase. It also made reference to this court's decision in *Richmond Power & Light v. FERC*,[14] affirming a Commission order that did not require downstream electric utilities to absorb additional transmission costs. Finally, Panhandle maintained that the Commission erred in speculating that Panhandle's increased costs could be recovered through its increased sales, since the cost to Panhandle for the gas and transpor-

---

11. See Petition for Intervention, *reprinted in* J.A. at 114–18.

12. *Trunkline Gas Co.*, Docket No. CP78–43 (17 Apr. 1978), *reprinted in* J.A. at 119–26.

13. Application for Rehearing, *reprinted in* J.A. at 127–32.

14. 187 U.S.App.D.C. 399, 574 F.2d 610 (1978).

tation was greater than the highest rate it was allowed to charge.

The Commission denied the application for rehearing on 25 September 1978.[15] Again, it pointed out that if Panhandle's rates were inadequate to recover its costs, it should file for an increase under section 4. The Commission would not, however,

permit Panhandle to include in Account No. 191, *Unrecovered purchased gas costs*, the costs incurred by it as a result of Trunkline's transportation of its gas. Such a course of action might have the effect of allowing Panhandle a rate increase when its rates, in the context of its *overall* cost of service *vis a vis* its *overall* revenues, might be fully adequate without such increase.[16]

While the Commission had "provided for tracking rate increases in the case of purchased gas costs in Order No. 452, . . . this did not extend to other cost elements, including transportation costs, such as are here sought by Panhandle." Although it prohibited the passing on of transportation costs, the Commission did not feel it improper to require flow-through of revenues via the PGA account "to prevent a pipeline from being unjustly enriched at the expense of customers." In any event, the Commission stated that Panhandle's objections to the crediting provision should not be pursued collaterally "in this proceeding, where they are of peripheral interest only."

The Commission distinguished the two cases that were cited by Panhandle as inconsistent with the Commission's refusal to allow the company to track its increased transportation costs. Those two cases involved tracking of storage costs, and were to be limited to their unique facts. The Commission then distinguished *Richmond Power* on two grounds: (1) it was a negotiated settlement, and (2) it "involved a coordinated response by many utilities to a special emergency situation at the behest of a

stated Commission policy." In response to Panhandle's request for a hearing to show that it was not recovering its costs, the Commission stated that the company was "free in these circumstances to file a rate increase pursuant to Section 4 of the Natural Gas Act at any time."

Panhandle filed a petition for review, No. 78–1960, on 28 September 1978, which was consolidated with Nos. 78–1356 and 78–1630 by order of the court on 3 October 1978.

C. *No. 78–1630*

The orders under review in No. 78–1630 concern two rate adjustment filings by Panhandle. The first grew out of a Commission certificated joint transportation service [17] wherein gas purchased by Northern Natural Gas Co. (Northern) in offshore Louisiana was transported by Stingray Pipeline Co. (Stingray), Natural Gas Pipeline Co. of America (Natural), Trunkline, and Panhandle for eventual redelivery to Northern. Because of the location of delivery and redelivery points of the gas, there is no actual transportation by Panhandle and therefore no additional charge for its services. Pursuant to Panhandle's FERC Rate Schedule T–18, Northern pays Panhandle a monthly charge representing the total transportation charges of Stingray, Natural, and Trunkline. Panhandle in turn pays to Trunkline the identical amount, pursuant to Trunkline's FERC Rate Schedule T–20. Thus, as to transportation charges payable by Northern, Panhandle appears to be simply a conduit between Northern and Trunkline.

On 6 February 1978 Panhandle filed a proposed rate change for Northern.[18] In its cover letter, Panhandle referenced only a decrease in Trunkline's transportation rates, but the attached worksheet made clear that the proposed change reflected a significant increase in the charge to Northern based on a higher rate to be paid Stingray.

---

**15.** *Trunkline Gas Co.*, Docket No. CP78–43 (25 Sept. 1978), *reprinted in* J.A. at 135–39.

**16.** *Id.* at 136.

**17.** *Northern Natural Gas Co.*, Docket No. CP77–450 (30 Sept. 1977), *reprinted in* J.A. at 72–76.

**18.** *Reprinted in* J.A. at 79–83. Docketed at No. RP78–39.

The second filing,[19] submitted 9 February 1978, involved a Commission approved transportation service by Trunkline and Panhandle for Central Illinois Public Service Co. (CIPSCO).[20] Panhandle's cover letter referenced Trunkline's general rate decrease, and the tariff sheets reflected only that rate decrease.

On 10 March 1978 the Commission by letter order accepted the proposed rate decrease as to CIPSCO, but rejected the increase as to Northern.[21] The Commission explained that Panhandle did not have tracking authority to reflect the rate changes, but the CIPSCO adjustment would be accepted anyway, since the proposed rate was equal to or lower than currently effective rates. The increased rate for Northern was rejected for lack of tracking authority.

Panhandle applied for a rehearing on 10 April 1978.[22] It contended that the rates and charges contained in the revised tariff sheets were obligatory under Panhandle's Rate Schedule T–18, were approved by prior Commission order, and therefore not subject to partial approval and partial rejection without any evidentiary basis, hearings, procedural safeguards, or finding supporting such action. The pipeline argued that it was improvident and erroneous to deny Panhandle's proposed increase when the Commission had approved Trunkline's application for the identical amount. Panhandle submitted that it was error for the Commission to waive its requirement of tracking authority to permit filing of rate reductions, and at the same time refuse to waive them as to rate increases. Panhandle pointed out that it would suffer a significant out-of-pocket loss unless it were permitted to pass through the increased charges.

The Commission denied the application for rehearing on 9 May 1978.[23] It explained that Panhandle had no authority under its transportation certificate to track changes in its rates, and that the acceptance of Trunkline's related rate decrease did not automatically entitle Panhandle to an increase. Trunkline's rate change, in accordance with regulations, was supported by cost-of-service evidence, while Panhandle's was not. That the increased transportation charge to Panhandle had been approved by the Commission did not entitle the company to pass on the increases in the absence of an approved tracker or a cost-of-service showing. The Commission held that it had discretion to accept the voluntarily filed rate decrease to benefit consumers, and to reject simultaneously a rate increase. It stated that waiver of its requirements is appropriate for good cause shown, but that Panhandle had not made such a showing in this case.

Panhandle filed its petition for review as to these orders on 6 July 1978.

## II. THE MERITS

It is hard to resist agreeing with Panhandle that the orders under review appear in various ways to put the squeeze on the pipeline, although to be sure the existence and degree of any pinch depends on which of several states of the world actually exists. In general, the Commission appears to take a quite liberal view of its own authority to require the flow-through of revenues, while imposing rather vigorous procedural standards on Panhandle in its effort to recover its additional costs. Whether the various procedures were valid or fair is a rather close question. Nevertheless, we think that the revenue crediting requirement in No. 78–1356 must be set aside as unauthorized by section 7, violative of Commission regulations, not premised on solidly based findings in the record, and unreasonable.

**19.** *Reprinted in* J.A. at 84–90. Docketed at No. RP78–40.

**20.** *Panhandle E. Pipe Line Co.,* Docket No. CP77–47 (19 Aug. 1977).

**21.** *Panhandle E. Pipe Line Co.,* Docket No. CP77–39 *et al.* (10 Mar. 1978), *reprinted in* J.A. at 91–92.

**22.** Application for Reconsideration and Rehearing, *reprinted in* J.A. at 93–97.

**23.** *Panhandle E. Pipe Line Co.,* Docket No. RP78–39 *et al.* (9 May 1978), *reprinted in* J.A. at 99–103.

Since Panhandle's objections to the Commission's order in No. 78–1960 relate largely to its inconsistency with the revenue crediting policy, the arguments are in great measure defused by our disposition of No. 78–1356. To the extent Panhandle is claiming to be entitled to recover increased transportation costs via Account 191, even in the absence of revenue crediting, we affirm the Commission's refusal. As to No. 78–1630, we think that when a pipeline is merely an accounting conduit for charges made by other pipelines, a proper case for waiver is presented. We therefore set aside that portion of the order disallowing Panhandle the right to track its increased cost, while affirming that portion approving the filing of decreased rates.

A. *No. 78–1356*

Panhandle contends in No. 78–1356 that the requirement that it credit its transportation revenues to Account 191, especially when it is prohibited from charging its transportation costs similarly, (1) violates section 5 of the Act, (2) runs roughshod over the Commission's regulations concerning the PGA clause, and (3) is in various ways unfair, discriminatory, and contrary to most precedent. The Commission counters that it is authorized under section 7 to impose such conditions on certificates, that the condition was necessary to prevent overcollection by Panhandle of fixed costs, and that the order violated neither Commission regulations nor precedent.

■ Although the objective of the Commission in fashioning the revenue crediting requirement may be laudable, the order must be set aside because we conclude that the Commission's section 7 conditioning power does not authorize the adjustment of rates charged customers not receiving the services to be certificated. We also find that the order violates the Commission's accounting regulations, does not rest on soundly based findings in the record and is unreasonable. Since we reverse on these grounds we do not find it necessary to reach Panhandle's contention that the order was discriminatory or contravened precedent.

1. *Section 7 Authority*

(a) *Ratemaking Under the Natural Gas Act*

The purpose of the Natural Gas Act was to "underwrite just and reasonable rates to the consumers of natural gas."[24] It was framed "to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges,"[25] and at the same time, to ensure that rates set be "consistent with the maintenance of adequate service in the public interest."[26]

Three interrelated sections constitute the "comprehensive and effective regulatory scheme"[27] Congress created with regard to ratemaking. Section 7 provides that to undertake the "transportation or sale of natural gas," an entity must first obtain "a certificate of public convenience and necessity issued by the Commission."[28] In issuing such certificates, the Commission has "the power to attach . . . such reasonable terms and conditions as the public convenience and necessity may require."[29] Once rates are authorized under section 7, a natural gas company may file for an in-

---

**24.** *Atlantic Ref. Co. v. Public Serv. Comm'n,* 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959) (citing *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) ).

**25.** *Id.*

**26.** Natural Gas Act § 7(c), 52 Stat. 821, 825 (1938) (current version at 15 U.S.C. § 717f(c) (1976) ). The deletion of this language by the 1942 amendment to § 7 was not intended to change this congressionally declared purpose. *See Hearings Before the House Interstate and*

*Foreign Commerce Comm. on H.R. 5249,* 77th Cong., 1st Sess. 18–19. *See generally* H.R. Rep.No. 1290, 77th Cong., 1st Sess. (1941); S.Rep.No. 948, 77th Cong., 2d Sess. (1942).

**27.** *Panhandle E. Pipe Line Co. v. Public Serv. Comm'n,* 332 U.S. 507, 520, 68 S.Ct. 190, 92 L.Ed. 128 (1947).

**28.** 15 U.S.C. § 717f(c) (1976).

**29.** *Id.* § 717f(e).

crease under section 4.[30] The company must file its rates thirty days before they go into effect.[31] The Commission may then suspend the new rate schedule for five months.[32] Thereafter the increased rates may be collected but the Commission may require a bond to ensure refunds of "increased rates or charges by its decision found not justified." [33] The burden of proof in section 4 proceedings is on the natural gas company.[34]

On the other hand, if rates are unjust or unreasonable, the Commission may adjust them pursuant to section 5.[35] This section provides that "[w]henever the Commission, after a hearing . . . shall find that any rate . . . is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate . . . and shall fix the same by order." [36] Section 5 rate adjustments may be prospective only,[37] and the Commission may not order rate increases unless the company has filed a new rate schedule.[38]

In the instant case, the Commission has attempted to effectuate the policies of the Natural Gas Act by mandating a flow-through of revenues to resale customers as a condition on a section 7 transportation certificate. The Commission has implicitly determined that permitting Panhandle to retain these transportation revenues would allow it to be "unjustly enriched at the expense of consumers." [39] Since theoretically Panhandle is already recovering from rates set in a prior rate settlement the fixed costs of the unused capacity that permits it to provide transportation services, "additional revenues covering the same fixed costs" are overcollections.[40]

Panhandle claims that if in fact the Commission believes its rates are too high, it must follow the customary procedures under section 5 of the Act which permits it to act only "after hearing" and only after a finding that Panhandle's overall rates are unjust.[41] The Commission argues that since the revenue crediting condition was imposed pursuant to the Commission's section 7 power, section 5 requirements of hearings and findings do not apply.[42]

The underlying premise of the Commission's argument is that it had authority under section 7 to condition the certificate to require revenue crediting, so long as the condition was "supported by soundly based findings in the record" and was reasonable.[43] We do not interpret section 7 so expansively.

### (b) The Scope of the Section 7 Conditioning Power

The actual language of section 7(e) is broad indeed. It states that in granting certificates: "The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." In the absence of sections 4 and 5 of the Act, this broad mandate conceivably could authorize adjustment of rates not involved in the actual certificate proceeding. But section 7's broad conditioning power must be read in

---

30. *Id.* § 717c.

31. *Id.* § 717c(d).

32. *Id.* § 717c(e).

33. *Id.*

34. *Id.*

35. *Id.* § 717d.

36. *Id.* § 717d(a).

37. *Atlantic Ref. Co. v. Public Serv. Comm'n,* 360 U.S. 378, 389, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

38. 15 U.S.C. § 717d(a) (1976).

39. *Trunkline Gas Co.,* Docket No. CP78–43 (25 Sept. 1978), *reprinted in* J.A. at 136 (explaining basis of revenue crediting in the instant order).

40. Brief for Respondent at 28.

41. Brief of Petitioner at 34.

42. Brief for Respondent at 28–30.

43. *Id.* at 17–22.

conjunction with sections 4 and 5. In that context, for three reasons we believe that the conditioning power does not extend to adjusting previously approved rates for services not before the Commission in the relevant certificate proceeding.

### (i) *Emasculation of the Role of Section 5*

First, the more expansive reading would effectively emasculate the role of section 5 in the ratemaking scheme. Any time the Commission had good reason to believe that a pipeline's rates were unjust or unreasonable, it could simply condition the granting of new certificates on the adjustment of those rates, the condition to terminate only when the pipeline filed a new rate proceeding under section 4. There would be no need for the Commission to use section 5 so long as pipelines continued requesting new certificates—instead, the Commission could simply condition certificates on rate reductions and shift the burden to the pipelines to show affirmatively that its previous rates continued to be just and reasonable. Section 5 would be reduced to a stopgap device, necessary for reducing unjust or unreasonable rates only when no new certificate filings were being made. We do not think that section 7 was meant to reduce so sharply the role of section 5, and therefore decline to adopt FERC's expansive interpretation of the conditioning power.[44]

### (ii) *Erosion of Protections Against Regulatory Lag and Rate Instability*

Although the Act's principal purpose is to protect consumers against excessive rates, a corollary purpose is to allow natural gas companies their cost of service and a reasonable rate of return.[45] Recognizing that it is in the public interest that companies receive adequate revenues to maintain high quality service, Congress designed sections 4 and 5 to protect companies against regulatory lag[46] and provide a degree of certainty in their rate schedules. Under section 4, once a company has filed a new rate schedule and the five-month statutory suspension period has elapsed, the rates go into effect—subject to a refund obligation. Thus, should administrative proceedings take longer than five months companies are protected against additional loss of revenues. Once rates are approved by certificate or in section 4 proceedings, the Commission may change them only after a section 5 hearing and specific findings that they are unjust or unreasonable.[47] Section 5 rate reduction orders may be prospective only. This ensures rate stability; companies may count on receiving previously approved revenues without the threat of an indefinite refund requirement at a later date.

Interpreting the conditioning power to allow adjustment of previously approved

---

44. One could, of course, take a more limited view of the scope of § 7(e) than does the Commission, and still sustain the disputed order. The narrower construction would provide that the strictures of § 5 could be avoided by revenue crediting only when unanticipated and relatively cost-free revenues are to be received by a pipeline from certificated services. Such an interpretation might not emasculate the role of § 5 so fully as does FERC's broad construction, and would still support revenue crediting in this case. But expanding the scope of § 7 in this more limited fashion would still significantly erode the role of § 5, and additionally dilute protections of §§ 4 and 5. *See* notes 45–52 and accompanying text, pp. ———— of 198 U.S. App.D.C., pp. 1129–1130 of 613 F.2d *infra.* The line must be drawn somewhere, and for reasons to be discussed we think the price adjustment powers of § 7(e) do not extend to previously approved rates for sales or services not before the Commission in the certification proceeding.

45. *See* note 26 *supra.*

46. *Algonquin Gas Transmission Co. v. FPC*, 175 U.S.App.D.C. 215, 219, 534 F.2d 952, 956 (1976) (referring to § 4 protections).

47. *See Atlantic Ref. Co. v. Public Serv. Comm'n*, 360 U.S. 378, 389, 392, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); *Colorado Interstate Gas Co. v. FPC*, 142 F.2d 943, 954 (10th Cir. 1944), *aff'd*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); *cf. Sierra Pac. Power Co. v. FPC*, 96 U.S.App.D.C. 140, 142, 223 F.2d 605, 607 (1955) (under § 206 of Federal Power Act—virtually identical to § 5 of Natural Gas Act—a finding of unreasonableness is a prerequisite to Commission modification of filed rate), *aff'd*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Of course, the Commission could also alter rates upon the company's making a new § 4 filing.

rates eliminates both protections in one fell swoop. Rate stability is destroyed because at any time a certificate is filed, immediate reductions may be ordered as to previously approved rates. Protections against revenue loss caused by administrative delay are seriously diluted. In addition to the thirty-day filing period and five-month rate suspension period prescribed by the Act, a pipeline would be deprived of the revenues from previously approved rates during the time necessary to prepare new section 4 filings.[48] Because the Commission's expansive view of the conditioning power would largely extinguish these protections of sections 4 and 5, we refuse to adopt it.

(iii) *Circumvention of Section 5 Requirements of Hearings and Findings*

Finally, we reject the broad interpretation of section 7 because it allows circumvention of section 5 requirements of a hearing and specific findings as to justness and reasonableness of existing rates. The law

seems clear that once rates are approved in certificates or rate proceedings, they may only be adjusted by the Commission after a finding that they are unjust, unreasonable, or not the lowest reasonable rate.[49] It would be ironic after rates have been approved as theoretically just and reasonable under section 4 to allow the Commission to reduce them by revenue crediting or other means without a specific finding that the rates are no longer just and reasonable.[50] We therefore decline to adopt the wider construction of section 7 that would do away with the section 5 requirement of hearings and findings before reducing rates.[51]

For these reasons we hold that FERC may not as a condition on a section 7 certificate require a pipeline to adjust rates previously approved by the Commission for customers not receiving the services to be certificated.[52]

---

**48.** Preparation for new § 4 filings apparently can be time consuming. If FERC's interpretation of § 7 were correct, to eliminate loss of revenues between the time of certificate grant and § 4 proceedings, a natural gas company could prepare a "defensive" filing before seeking new certificates. We decline to force companies, when seeking transportation or other certificates, to choose between preparing massive rate filings beforehand or risking additional revenue loss during the preparation of new § 4 filings after imposition of a revenue crediting requirement.

**49.** *See* note 47 *supra.*

**50.** It may not be quite so unseemly to condition a certificate on reduction of other rates previously certificated but not yet approved as just and reasonable. That question is not before us. The rates here reduced had previously been approved by the Commission in *Panhandle E. Pipe Line Co.,* Docket No. RP75–102.

**51.** An argument could be made that the condition before us would be permissible under §§ 5 and 7 if imposed after an appropriate hearing and findings. The Commission could consider the justness and reasonableness of a pipeline's rate structure in light of new revenues as part of the certificate hearing required by § 7(e), and enter proper findings before mandating revenue crediting. Since the Commission did not follow such a procedure here, the question is not squarely before us, and we do not rule on it. We do, however, doubt the practical utility of such a hybrid device. Once the hearing and

finding requirements of § 5 are met, there is no need to impose rate reductions by certificate condition, it may be done in a straightforward manner under § 5.

**52.** Judge Wright attempts to "quickly dispose[ ]" of the serious issues raised by the Commission's § 7 order by claiming that rates are not adjusted at all. He claims that "[r]ates are not adjusted; only the size of future rate changes via the purchased gas account is affected." Concurring and Dissenting Opinion at —— of 198 U.S.App.D.C., at 1146 of 613 F.2d. This is a difference without a distinction. Under the Commission's order, new transportation revenues are placed in Account 191 (the unrecovered purchased gas account) to be offset against any gas price increases or aggregated with price decreases. When the subsequent six-month purchased gas adjustment order issues, the net result is a lower rate than that which resale customers would otherwise pay. *It is this tinkering with previously approved rate schedules for resale customers that we find objectionable.*

We think it fair to say that a focal point of our disagreement with Judge Wright is the proper characterization of the revenue crediting order. He views the essence of the challenged order as "govern[ing] the use of revenues generated from a new service." *Id.* at —— of 198 U.S.App.D.C., at 1144 of 613 F.2d. Because the pipeline's rate of return arguably is the same after revenue crediting as it was before any transportation revenues were re-

### (c) Case Law

The Commission cites a great many cases to show the "considerable breadth" of its conditioning authority under section 7(e). The decisions are distinguishable from the case at hand, and we do not find them controlling.

FERC initially cites the Supreme Court's seminal opinion in *Atlantic Refining Co. v. Public Service Commission (CATCO)*.[53] There, the Court declared that the Commission should give "a most careful scrutiny and responsible reaction to *initial price proposals* of producers under § 7."[54] The Court noted that the interminable delay involved in section 5 proceedings, "the fact that the Commission was not given the power to suspend initial rates under § 7," and the absence under section 5 of a refund protection make "it the more important . . . that 'this crucial sale should not be permanently certificated unless the rate level has been shown to be in the public interest.' "[55] Without appropriate rate conditions in the certificate, "a windfall for the natural gas company with a consequent squall for the consumers" could result. The Court found that "[t]his the Congress did not intend."[56]

The Court continued,

> There is, of course, available in such a situation, a method by which the appli-

cant and the Commission can arrive at a rate that is in keeping with the public convenience and necessity. The Congress, in § 7(e), has authorized the Commission to condition certificates in such manner as the public convenience and necessity may require. Where the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of "favored nation" clauses or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary.[57]

The Court noted that in allowing the Commission to attach rate conditions on certificates, "§ 7 is given only that scope necessary for 'a single statutory scheme under which all rates are established initially by the natural gas companies . . . subject to being modified by the Commission.' "[58] Further, "[s]ection 7 procedures in such situations thus act to hold the line awaiting adjudication of a just and reasonable rate."[59]

The other decisions cited us generally expand or refine this section 7(e) conditioning power regarding rates and contractual pro-

---

ceived, Judge Wright suggests that § 5 is not emasculated, protections against regulatory lag and rate instability are not eroded, and the hearing and finding requirements of § 5 are not circumvented. *Id.* at ———— of 198 U.S.App. D.C., 1146–1147 of 613 F.2d. He submits that here the Commission has used its § 7 powers to "hold the line" on Panhandle's rate of return. *Id.* at —— of 198 U.S.App.D.C., at 1146 of 613 F.2d.

In our view, *the essence of the Commission's order is the adjustment of previously approved rates to reach the regulatory end of preventing any increase in Panhandle's profits (or mitigation of losses) from receipt of new transportation revenues.* Assuming this questionable regulatory objective to be valid, we believe *the means of implementing it used by the Commission is impermissible.* While the Commission may consider a pipeline's rate of return in setting prices for certificated services, we do not believe FERC may order changes in other, previously approved, rates in the name of preventing a possible increase in the rate of return. Allowing the Commission to do so—even when

the rate reductions are limited by the amount of revenue credited—significantly undercuts the policies of §§ 4 and 5 as we have here outlined.

**53.** 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

**54.** *Id.* at 391, 79 S.Ct. at 1255 (emphasis added).

**55.** *Id.* at 389–90, 79 S.Ct. at 1254 (quoting *Continental Oil Co.,* 17 F.P.C. 563, 575 (1957)).

**56.** *Id.* at 390, 79 S.Ct. at 1254.

**57.** *Id.* at 391, 79 S.Ct. at 1255.

**58.** *Id.* at 392, 79 S.Ct. at 1255 (quoting *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 341, 76 S.Ct. 373, 100 L.Ed. 373 (1956)).

**59.** *Id.*

visions for the services to be certificated.[60] As to rate conditions, the decisions accord with the principle that *section 7 may be used "to hold the line awaiting adjudication of a just and reasonable rate."*[61]

*Here, the Commission has not acted just to hold the line on certificated rates, but to adjust other, previously approved rates as well.*[62] FERC has not cited, and our own research does not disclose, any judicial authority holding that the Commission may tinker with rates previously found just and reasonable in conditioning a certificate dealing with other sales or services. For the reasons already mentioned, we decline to so extend the Commission's conditioning powers.

In addition, we note that the considerations mandating the use of section 7 to set initial rates for certificated sales or services do not require its use to adjust previously approved rates for other services. As the Supreme Court noted in CATCO, when initial rates are set the only protection consumers have against excessive rates, other than the Commission's section 7 scrutiny of proposed rates, is the possibility of a subsequent section 5 proceeding to lower rates.[63] The delay, lack of suspension power, and lack of power to order retroactive relief in section 5 proceedings make it important for the Commission to "hold the line [by certificate condition] awaiting adjudication of just and reasonable rate[s]."[64] Here, just and reasonable rates have already been adjudicated, at least by settlement approved by the Commission. The resale customers have had the protection of a section 4 proceeding with its refund and suspension provisions, and as well have continuing protection of section 5, inadequate though it may be of itself. The rates have already been approved as theoretically just and reasona-

60. *United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223, 229–30, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965) (where reviewing court finds that unconditional permanent certificate permitted excessive rate, Commission on remand may condition certificate to require refunds for period company sold gas at prices exceeding those properly determined to be in public interest); *FPC v. Hunt,* 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964) (Commission may condition temporary certificate on maintenance of prescribed price during period of temporary authorization, § 4 procedures to change rates become applicable at time of permanent or unconditioned temporary certification); *Algonquin Gas Transmission Co. v. FPC,* 175 U.S.App.D.C. 215, 218–20, 534 F.2d 952, 955–57 (1976) (§ 7 rate conditions offer mechanism to "hold the line" on initial rates until regular rate setting provisions of the Act come into play); *Consumer Fed'n of America v. FPC,* 169 U.S.App.D.C. 116, 125, 515 F.2d 347, 356 (preservation of statutory scheme depends on diligent enforcement of § 7 certification requirement as a holding operation on initial rates), *cert. denied,* 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975); *Public Serv. Comm'n v. FPC,* 177 U.S. App.D.C. 272, 338, 543 F.2d 757, 823 (1974) (dicta that Commission, pursuant to § 7, may order pipeline to flow through to customers rate reductions and refunds by producers), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *California Oil Co. v. FPC,* 315 F.2d 652, 655–57 (10th Cir. 1963) (Commission has power to set "in-line" price as certificate condition); *Pure Oil Co. v. FPC,* 292 F.2d 350, 352–53 (7th Cir. 1961) (authority to set initial sales prices when supported by soundly based find-ings in the record); *Texaco Inc. v. FPC,* 290 F.2d 149, 154–55 (5th Cir. 1961) (power to set initial prices).

61. *CATCO,* 360 U.S. at 392, 79 S.Ct. at 1255 (emphasis added); *see, e.g., Algonquin Gas Transmission Co. v. FPC,* 175 U.S.App.D.C. 215, 218, 534 F.2d 952, 955 (1976); *Consumer Fed'n of America v. FPC,* 169 U.S.App.D.C. 116, 125, 515 F.2d 347, 356 *cert. denied,* 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975).

62. Chief Judge Wright suggests that because FERC's order is intended to leave Panhandle's "rate of return at exactly the same level as before the order," it is a "classic" example of use of the § 7 conditioning power to "hold the line" pending a full cost-of-service proceeding. Concurring and Dissenting Opinion at —— —— of 198 U.S.App.D.C., at 1146–1147 of 613 F.2d. However, the classic use of § 7 is to "hold the line" on *rates* not rates of return. *See* notes 59–61 and accompanying text pp. —— —— of 198 U.S.App.D.C., pp. 1131–1132 of 613 F.2d *supra.* We are not aware of, and Judge Wright does not refer to, any case approving FERC adjustment in § 7 proceedings of rates not before it with the objective of "holding the line" on the rate of return.

63. *See* 360 U.S. at 392, 79 S.Ct. at 1255.

64. *Id. See* note 55 and accompanying text p. —— of 198 U.S.App.D.C., p. 1131 of 613 F.2d *supra.*

ble, and therefore the spectre of "a windfall for the natural gas company with a consequent squall for the consumers" is not so ominous in the absence of certificate conditioning, as it is where initial rates are proposed. Since the public interest here seems to be adequately protected by sections 4 and 5, we do not feel that the cited cases require us to extend the scope of section 7 to allow adjustment of previously approved rates for services not involved in the pertinent certificate proceeding.

### (d) Conclusion as to Section 7 Authority

█ Because we believe a contrary interpretation would emasculate the role of section 5, dilute the protections provided in sections 4 and 5 against regulatory lag and rate instability, and eliminate section 5 protections of hearings and specific findings as to justness and reasonableness of rates prior to a rate reduction order, and in the absence of binding contrary precedent, we hold that the Commission does not have authority under section 7 to compel flow-through of revenues to customers of services not under consideration in that proceeding for certification.[65]

In so doing, we do not mean to intimate that FERC may not take a company's overall rate structure into consideration in issuing certificate orders. It may evaluate that and myriad other factors as they bear on the public convenience and necessity. The Commission may not, however, order adjustments in previously approved rates for services not before it in the certificate proceeding.

We recognize that there may be instances where certification of essentially cost-free transportation services will push a company's rate of return over the just and reasonable level. Nevertheless, we do not believe the solution to the problem is to ignore the policies and protections of sections 4 and 5 and forbid companies to keep revenues pending a section 4 filing. We think a more acceptable and equitable solution would be the adoption by the Commission in appropriate proceedings[66] of some sort of "tracker" system for transportation revenues and costs similar to the PGA clause.[67] A tracker system would avoid the infirmities of the Commission's order here—it would not eliminate the role of section 5, it would avoid revenue loss caused by administrative lag and provide rate stability, and it would not run afoul of the section 5 policies of hearings and findings. Further, such a tracker would allow resale customers to receive the benefits and bear the burdens of transportation services provided by and for other companies. We cannot force the Commission to adopt such a system, but today's holding certainly should not be viewed as precluding use of transportation tracking clauses as approved in appropriate proceedings.[68]

---

**65.** We think Chief Judge Wright tacitly agrees with us when he states that "*Section 4 is the mechanism for evaluating changes in the costs associated with already certificated services, while Section 7 provides the mechanism for pricing and conditioning new services.*" Concurring and Dissenting Opinion at —— of 198 U.S.App.D.C., 1147 of 613 F.2d (emphasis added). This dichotomy drawn in his opinion strongly supports our conclusion that a § 7 proceeding is not the appropriate occasion for adjustment of previously approved rates not then before the Commission.

**66.** For instance, the Commission might begin approving tracking clauses in individual § 4 proceedings, or it might by rulemaking adopt a policy allowing inclusion of such clauses in rate filings under § 4.

**67.** Judge Wright suggests that it is more appropriate to decide whether costs and revenues associated with new services should be "flowed through" at the time of their certification proceeding than to require the existence of a tracking provision as a prerequisite. Concurring and Dissenting Opinion at —— n.18 of 198 U.S. App.D.C., at 1145 n.18 of 613 F.2d. We think that the proper time to decide what factors will affect approved rates is at the time they are set, not afterward. Once rates and rate adjustment mechanisms have been approved in a § 4 proceeding, we do not think the Commission has power to further adjust them in a subsequent § 7 proceeding certificating a new service.

**68.** Thus, we cannot agree with Judge Wright's implication that our disposition of Nos. 78–1356 and 1960 "effectively prevent[s] the Commission from adopting expeditious procedures altogether" for dealing with changes in various costs and revenues occurring between § 4 proceedings. Concurring and Dissenting Opinion at —— of 198 U.S.App.D.C., at 1144 of 613

### 2. Violation of Commission Regulations

The purchased gas adjustment clause provisions [69] were adopted by the Commission to "permit pipeline companies to protect themselves against supplier rate increases." [70] The clause allows pipelines to adjust their rates semiannually to reflect changes in unrecovered purchased gas costs. In the meantime, purchased gas costs above or below the current adjustment are placed in a deferred account (Account 191), to be recovered over the next six-month period as a surcharge to the rates, or in the case of lower costs, a reduction in the rates. [71] This relieves pipelines of the burden of continuous rate filings, enabling them to recover expeditiously "the cost of purchased gas [which] constitutes the largest single component of their cost of service." [72]

The unrecovered purchased gas cost account is Account 191 of the Uniform System of Accounts for Natural Gas Companies. It provides:

191 Unrecovered purchased gas costs.
A. This account shall include purchased gas costs related to Commission approved purchased gas adjustment clauses when such costs are not included in the utility's rate schedules on file with the Commission. [73]

The pertinent regulation defines "purchased gas cost" as

the cost of wellhead purchases, field line purchases, plant outlet purchases, transmission line purchases, and pipeline production from leases acquired on and after October 7, 1969. Nonconcurrent exchange transactions may be reflected as a cost of purchased gas. [74]

Panhandle points out that these regulations nowhere permit inclusion of transportation costs or revenues. It argues that the subject revenues should instead be credited to Account 489, titled "Revenues from transportation of gas for others." [75]

Panhandle also argues that the challenged order violates longstanding Commission precedent and lists a number of cases where the Commission has refused to allow inclusion of transportation costs in a PGA

---

F.2d. Our disposition leaves open the option of adopting tracking clauses similar to the PGA provision to handle interim changes of transportation costs and revenues. A more novel solution where no tracking provision exists would be for the Commission to approve the transportation services subject to a "cross-refund" to Panhandle's customers in the event a subsequent ratemaking disclosed that its rates had been unjust or unreasonable. We note that such a procedure would not emasculate the role of § 5, engender administrative delay and consequent revenue loss, nor eliminate hearings and findings as to justness and reasonableness of rates in the administrative process. *In addition, a refund condition would have the advantage of imposing no irretrievable loss on the company or the consumer.* There is a possibility that the "cross-refund" condition somehow might run afoul of the implied proscription of retroactive relief in § 5; whether that of itself would invalidate the procedure is an issue we do not decide.

**69.** Chief Judge Wright suggests that in this section we tacitly endorse the PGA regulations, and claims that this is inconsistent with our holding that revenue crediting is unauthorized by § 7. Concurring and Dissenting Opinion at —— n.19 of 198 U.S.App.D.C., at 1145 n.19 of 613 F.2d. We think that revenue crediting as here imposed and the PGA provisions are dis-

tinguishable. The Commission ordered revenue crediting under its purported *§ 7 authority*; the PGA mechanism must be adopted and approved at a *§ 4 proceeding* before any price adjustment may be made. To what extent the PGA regulations "alter the statutory scheme," *id.* at —— n.19 of 198 U.S.App.D.C., at 1145 n.19 of 613 F.2d, if any, and whether any such "alteration" is permissible under § 4, are issues not presented in this appeal, and we do not decide them.

**70.** Order No. 452, 47 F.P.C. 1049, 1050 (1972).

**71.** 18 C.F.R. § 154.38(d)(4) (1979).

**72.** Order No. 452, 47 F.P.C. 1049, 1050 (1972).

**73.** 18 C.F.R. § 201 (1979).

**74.** 18 C.F.R. § 154.38(d)(4) n.1 (1979).

**75.** 489 Revenues from transportation of gas of others.
    This account shall include revenues from transporting gas for other companies through the production, transmission, and distribution lines, or compressor stations of the utility.
    18 C.F.R. § 201 (1979).

clause.[76] FERC distinguishes these decisions on the basis that they involved pass-through of costs, not revenues.[77] To demonstrate that the order under review is in accord with Commission precedent, it cites a number of recent orders, none judicially reviewed, in which it has ordered crediting of transportation revenues.[78]

Thus the Commission's position seems to be that the PGA regulations allow pass-through of transportation revenues, but not of costs. We do not read the carefully constructed purchased gas regulations so loosely. Account 191 applies to *costs*, not *revenues*, and to *purchased gas* items, not *transportation* items. Moreover, Account 489 by its terms appears to be the proper locus for transportation revenues.

The Commission agrees that Account 489 "is the usual situs for revenues," but it claims that use of that account "would be inappropriate here" because Account 489 "defers revenues until a rate change proceeding under Section 4, and has no provision for flowing excess revenues back to Panhandle's jurisdictional customers."[79] Also conceding that nothing in the PGA regulations speaks to transportation costs and revenues, the Commission argues that "nothing specifically precludes using these mechanisms to respond to the Commission's regulatory purposes."[80] It then cites authority that its powers must be construed broadly in the public interest.[81] It points out that in the absence of the condition, Panhandle would continue to "overcollect . . . the excess transportation revenues."[82]

We agree that " 'the Commission's broad responsibilities . . . demand a generous construction of its statutory authority,' "[83] but we do not believe the Commission should have authority to play fast and loose with its own regulations. It has become axiomatic that an agency is bound by its own regulations.[84] The fact that a regulation as written does not provide FERC a quick way to reach a desired result does not authorize it to ignore the regulation or label it "inappropriate."[85]

Thus, the order under review must be set aside because in requiring crediting of *transportation revenues* to the *purchased*

---

**76.** *See* Brief of Petitioner at 42. In its order denying rehearing in No. 78–1960, affirmed by us today, *see* Part II B *infra*, the Commission stated that authorization for tracking rate increases for purchased gas "did not extend to other cost elements, including transportation costs, such as are here sought by Panhandle." *Trunkline Gas Co.*, Docket No. CP78–43 (25 Sept. 1978), *reprinted in* J.A. at 136.

**77.** Brief for Respondent at 45.

**78.** *See* decisions cited *id.* at 44.

**79.** *Id.* at 40.

**80.** *Id.* at 41.

**81.** *E.g., FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

**82.** Brief for Respondent at 42 n.28.

**83.** *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 642, 92 S.Ct. 1827, 1839, 32 L.Ed.2d 369 (1972) (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 776, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) ).

**84.** *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Union of Concerned Scientists v. AEC*, 163 U.S.App.D.C. 64, 77, 499 F.2d 1069, 1082 (1974); *see United States v. Nixon*, 418 U.S. 683, 695–96, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Note, *Violations by Agencies of Their Own Regulations*, 87 Harv.L.Rev. 629 (1974).

**85.** Judge Wright suggests that the regulation's name "is inapt and the description incomplete," but because the regulation did not specifically forbid flow-through of transportation revenues, the "court should not mistake clumsy agency nomenclature for unlawful agency action." Concurring and Dissenting Opinion at —— of 198 U.S.App.D.C., at 1148 of 613 F.2d. As we read the regulation and the order accompanying its promulgation, there was nothing clumsy or inapt about its name and description. The carefully constructed PGA provisions were meant only to pass on purchased gas cost adjustments; they were not meant to be a catch-all through which the agency could make any interim adjustment it desired. While we generally should defer to agency interpretations of its own regulations, that is not appropriate here where the applicable regulations provide on their face that new transportation revenues belong in Account 489, not 191.

*gas* account, the Commission violated its own regulations.[86]

### 3. *The Condition Is Not Supported by Soundly Based Findings and Is Unreasonable*

■ Even assuming the revenue crediting provision did not violate Commission regulations and was within the ambit of the section 7(e) conditioning power, we find that the condition was not supported by soundly based findings in the record and was not reasonable.[87]

### (a) *Basis for Revenue Crediting*

The Commission's theory for attaching the certificate condition is that (1) Panhandle's extant configuration of rates was designed to recover its full cost of service; (2) consequently, any uncontemplated revenues, such as those obtained through the transportation services in question, would permit double recovery of certain of Panhandle's items of cost and would *pro tanto* raise Panhandle's rate of return, and consequently rates charged, above the just and reasonable level.[88] If the state of the world were as the Commission assumes it to be,

the challenged condition in fact may have been reasonable. But, as Panhandle is at pains to emphasize throughout its brief, there is no reason to assume that existing revenues are adequate. The Commission's argument depends on the justness and reasonableness of the rates prescribed in Panhandle's 1975 ratemaking case.[89] Although the rates may have been just and reasonable in 1975 it is plain that they need not be so at present. If Panhandle's revenues do not presently recover the full cost of service, then the Commission's argument is substantively incorrect and works rather harshly.

It is not without significance that the Commission at no point made an express finding that Panhandle's rates continued to recover its full cost of service. The Commission merely assumed that they did. This seems to us a rather precarious assumption to make in view of the rising costs[90] in almost all aspects of society between the time the rate case was filed and the instant order entered. The validity of the assumption is also undermined by increases in need for and costs of transportation services, as evidenced in No. 78–1960. Further, as the Commission observed, the general rate level

---

86. Under authority of the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301–3432 (West Supp. 1979), the Commission recently issued new regulations requiring interstate pipelines to credit to Account 191 and thereby "flow back" to their customers revenues from transportation of natural gas for intrastate pipelines and local distribution companies to the extent such transportation revenues and volumes exceed representative levels used in determining cost of service and establishing rates. 44 Fed. Reg. 52185 (1979) (final rule amending 18 C.F.R. § 284.103). The Commission adopted the same rule respecting transportation agreements with certain end-users. 44 Fed.Reg. 30329–30 (1979) (to be codified at 18 C.F.R. § 284.205(b) ). Since the enactment of the statute and promulgation of the regulations occurred after entry of the instant order, they provide no support for the Commission's decision here. The validity of the new regulations is not an issue in this case, and consequently we leave that question undecided.

87. *See California Oil Co. v. FPC*, 315 F.2d 652, 656 (10th Cir. 1963); *Pure Oil Co. v. FPC*, 292 F.2d 350, 352–53 (7th Cir. 1961) (both cases

hold that certificate conditions must be supported by soundly based findings in the record).

88. Initially it appears that the Commission thought of the transportation services utilizing Panhandle's previously excess capacity as being costless and consequently required that the resulting revenues be fully credited against Account 191. The Commission on rehearing this case modified its initial position slightly, permitting the incremental costs associated with the transportation service to be offset against revenues prior to entry into Account 191. *See* note 9 and accompanying text p. —— of 198 U.S.App.D.C., p. 1123 of 613 F.2d *supra*.

89. *Panhandle E. Pipe Line Co.*, Docket No. RP75–102 (the relevant order approving the settlement in part was issued 25 April 1977).

90. The Commission acknowledged in *Natural Gas Pipeline Co. of America*, Docket No. CP78–439 (26 Dec. 1978), 5 F.E.R.C.—that pipeline utility costs have risen more than 36% since 1975 when Panhandle made its rate filing.

for Panhandle is presently the subject of another proceeding.[91]

We do not think that the Commission's dubious assumption as to the continuing adequacy of the 1975 rates qualifies as a "soundly based finding[ ] in the record" upon which section 7(e) conditions must be founded. In the absence of such support, the order must be set aside.[92]

(b) *Disallowing Offset of Revenues by New Transportation Costs Was Unreasonable*

Assuming arguendo that the Commission's order was authorized by section 7, did not violate its regulations, and was otherwise supported by soundly based findings in the record, we think the order was unreasonable because it did not allow offset of revenues by increased transportation costs. In its application for reconsideration and rehearing to FERC in the LOF proceeding, Panhandle urged that requiring crediting of revenues and prohibiting flow-through of increased transportation costs constituted a

double penalty. The company expressed a willingness to develop with the Commission staff "an appropriate provision dealing with the flow-through of transportation costs paid by Panhandle to others as well as transportation revenues received by Panhandle from others."[93] The Commission's response was that Panhandle was free at any time to submit a section 4 general rate change in the event its other transportation costs were preventing it from earning a reasonable return.[94]

Panhandle argues that the Commission's "facile response . . . fall[s] woefully shy of the 'reasoned consideration' standard that is required by law."[95] FERC maintains its disposition was correct because the revenue crediting requirement was "directly connected" to the Commission's section 7 conditioning power, but the request to flow through costs for "unspecified transportation services" was "more suited to a general rate case where a general tracking provision might be allowed."[96]

---

**91.** Docket No. RP78–62.

**92.** Our colleague argues that until Panhandle's rates "are revised, the Commission may operate as if they were still" adequate. He notes the language in *California Oil Co. v. FPC*, 315 F.2d 652, 655 (10th Cir. 1963), that § 7 proceedings are not "rate" cases involving "the complex and intricate problems as to what is a 'just and reasonable' price." Concurring and Dissenting Opinion at —— n.24, —— n.25 of 198 U.S.App.D.C., at 1148 n.24, 1149 n.25 of 613 F.2d. We agree that § 7 proceedings should not involve the question of what is a just and reasonable rate. But since the basis of the challenged order appears to be that increased transportation revenues will unduly raise Panhandle's rate of return—making its rates unjust and unreasonable—we think the Commission is obligated to find support for its assumptions in the record. In this case, we think the Commission's reference to the prior, and possibly outdated, rate case is inadequate support for the condition.

Judge Wright also suggests that "Panhandle has no more right to *increase* its rate of return by keeping new transportation revenues—without resorting to Section 4—than FERC has to *decrease* the rate of return using its Section 7 powers." *Id.* at —— of 198 U.S.App. D.C., at 1148 of 613 F.2d. We disagree. As we read the Act, if a pipeline desires to earn more money by providing a new service, it need simply apply for a § 7 certificate. No-

where do we find a requirement that the pipeline also initiate a § 4 proceeding to be able to retain such revenues. If the Commission fears that such new services will drive the pipeline's rate of return above the just and reasonable level, it may resort to a § 5 proceeding, or utilize other possible remedies we outlined at notes 66–68 and accompanying text p. —— of 198 U.S.App.D.C., p. 1133 of 613 F.2d *supra*.

**93.** Application for Reconsideration and Rehearing, *reprinted in* J.A. at 65–66.

**94.** *Panhandle E. Pipe Line Co.*, Docket No. CP77–479 (22 Feb. 1978), *reprinted in* J.A. at 69.

**95.** Brief of Petitioner at 36.

**96.** Brief for Respondent at 31. The Commission also argues that to the extent Panhandle's request sought "to pass on additional charges to its customers," § 4 would require a full cost-of-service showing. *Id.* However, we think that if the Commission had power under § 7 to adjust rates downward without a § 5 proceeding (as we here assume arguendo), it would similarly have authority under § 7 to allow rates to rise without a § 4 proceeding. And even if § 4 somehow prevented flow-through of net transportation cost increases, the Commission at least should have allowed

We find the Commission's justifications inadequate. The fact that Panhandle could seek a tracking provision in a rate case does not make inappropriate the allowance of an offset of transportation costs against transportation revenues before crediting the balance for resale customers. Furthermore, we think such a netting procedure would be essential where both transportation costs and revenues were unanticipated—even assuming the pipeline was in other respects recovering its costs. The unforeseen income may increase a pipeline's revenues above the just and reasonable level, but the unforeseen costs, at the same time, would directly reduce the size of this "over-collection." If any amount needed to be credited under the Commission's theory, we think it would be the unanticipated revenues from transportation for others less the unanticipated costs of transportation by other pipelines.

Therefore, we think the Commission's order was unreasonable to the extent it did not allow netting out of new transportation costs prior to the entry of the credit in Account 191.[97]

### 4. *Conclusion—No. 78–1356*

Because the order under review in No. 1356 constituted an improper exercise of the Commission's section 7 conditioning power, violated the Commission's accounting regulations, was not supported by soundly based findings in the record, and was unreasonable in the absence of an offset, we set it aside, and remand the case for further proceedings not inconsistent with this opinion.

the new revenues to be offset by new costs to the extent costs did not exceed revenues, since no net increases in costs would thereby result.

97. In his opinion concurring in part and dissenting in part, Chief Judge Wright agrees with us that the Commission acted unreasonably in treating transportation costs and revenues differently. However, he also claims that our holding the Commission's action unreasonable as an additional ground for reversal gives rise to the anomaly of "alternative holdings" leading to "different results." Concurring and Dissenting Opinion at —— n.19 of 198 U.S.App. D.C., at 1145 n.19 of 613 F.2d. This is not the case. We do not mean to imply that the invalidity of the instant order would be remedied

### B. *No. 78–1960*

The order under review in No. 78–1960 involved the Commission's disposition of a Panhandle filing "prepared in an effort to find an acceptable solution to the serious problems" flowing from FERC's revenue crediting policy.[98] Panhandle's proposal was to include additional transportation costs and charges in Account 191 in the same way it was compelled to credit its transportation revenues. The Commission rejected the suggestion. Because we today invalidate the revenue crediting policy, in large measure the questions raised in this petition resolve themselves. To the extent issues in this petition are not mooted by our disposition of No. 78–1356, we affirm the Commission's order.

Panhandle argues that the Commission's refusal to allow the pipeline "to recover, as an offset to Account No. 191," new transportation costs was based upon "bald, wholly unsupported assumptions as to the adequacy of Panhandle's overall rate level," and therefore violated section 5.[99] If Panhandle is referring to the Commission's refusal to net out transportation costs from revenues before crediting, there may be some validity to the argument.[100] That question is mooted, however, since we void the revenue crediting procedure in No. 78–1356. If, on the other hand, Panhandle is arguing that prohibiting flow-through of transportation costs is violative of section 5 even in the absence of revenue crediting, we cannot agree. Refusal to allow flow-

merely by an infusion of evenhanded treatment of revenues and costs. On remand, under our decision, not only must the Commission's orders stay within the bounds of reasonableness, but also within parameters supported by sufficient findings with record support, its statutory authority, and its regulations.

98. Supplemental Brief of Petitioner at 6.

99. *Id.* at 9.

100. Indeed, elsewhere in today's opinion we hold it unreasonable to disallow an appropriate offset before crediting.

through of increased costs does not constitute a rate change, and therefore the policies of section 5 simply do not apply.

Panhandle also contends that the Commission has confused the provisions of sections 4 and 5, by "thrust[ing] upon Panhandle an unlawful requirement that it forfeit its new transportation revenues automatically, and in addition be obliged to commence Section 4 general rate case proceedings to restore the funds needed to meet its expenses for transportation for others." [101] Again, in view of today's holding, this issue is moot.

The pipeline submits that it is error for the Commission to interpret the PGA regulations to include transportation revenues but not costs. It argues, "The Commission cannot have it both ways. Either its regulations permit including transportation items in the purchased gas accounts or they do not. Panhandle submits that they do not . . . ." [102] We agree with Panhandle. But since the PGA regulations do not permit inclusion of transportation items, the Commission's refusal to allow transportation costs to flow through Account 191 must be upheld.

■ Panhandle's final argument is that it is arbitrary and contrary to precedent to disallow pass-through of increased transportation costs. It argues that since the Commission's assumption regarding Panhandle's PGA clause is that the pipeline "cannot absorb additional gas purchase expenses, and must recover such costs through the PGA clause, it is not permissible for the Commission to assume at the same time that the related transportation costs can be absorbed—at least without some examination of the cost of service and Panhandle's

revenue requirements." [103] If Panhandle is arguing that refusal to allow transportation cost recovery is arbitrary in the context of the revenue crediting requirement, the argument is moot. If it is suggesting that it is absolutely entitled to pass on transportation costs in the absence of an affirmative finding by the Commission that the pipeline can absorb the increased costs, we disagree. It probably would be wise for the Commission to adopt a mechanism in appropriate proceedings allowing transportation costs similar treatment to that of purchased gas costs, but we do not think it arbitrary for the Commission to refuse to expand the definition of purchased gas costs to benefit Panhandle in a section 7 certificate proceeding for Trunkline. We think the decision to construe narrowly the PGA regulation falls within that zone of reasonableness immunizing it from reversal.

Panhandle points out that in *Tennessee Gas Pipeline Co.*[104] and *Texas Eastern Transmission Corp.*[105] the Commission allowed tracking of transportation charges. These cases involved special storage arrangements, and the Commission was careful in each one to deny precedential value to the cases. The holdings have not been followed in subsequent cases, and FERC submits that *Tennessee Gas* and *Texas Eastern* "are anomalies in a sea of consistent Commission rulings rejecting rate filings of this nature." [106] It is not denied that the Commission has a policy against permitting tracking of transportation charges outside of settlement agreements. That the Commission granted two *sui generis* exceptions when special storage arrangements were involved certainly does not compel it to allow tracking when more general transportation situations arise.[107]

101. Supplemental Brief of Petitioner at 14.

102. *Id.* at 18.

103. *Id.* at 19.

104. Docket No. CP77–419 (10 Nov. 1977).

105. Docket No. CP77–313 (27 Jan. 1978).

106. Brief for Respondent at 52.

107. Similarly, we do not believe the narrow holding in *Richmond Power & Light v. FERC*, 187 U.S.App.D.C. 399, 574 F.2d 610 (1978) requires the Commission to allow Panhandle to track transportation cost increases. In *Richmond*, this court held merely that the Commission had "reached an informed and reasoned decision" in permitting transmitters of electricity in the "coal by wire" program to include fixed costs in their special short term services without having to credit the transmission reve-

Therefore, we conclude that the order in No. 78–1960 must be affirmed to the extent that the issues therein are not mooted by our disposition of No. 78–1356.

### C. No. 78–1630

The orders reviewed in No. 78–1630 are related to those in Nos. 78–1356 and 1960 in that they involve rates charged and costs incurred by Panhandle for natural gas transportation services. The pipeline argues that it was arbitrary for the Commission to waive its requirements of a full cost-of-service showing to allow a rate decrease, but refuse to do so as to a related cost increase.[108] The Commission responds that its primary duty is to protect the interest of consumers, and therefore waiving requirements to allow rate decreases, but not increases, was within the breadth of its discretion. FERC concedes that Panhandle "has now set forth in its brief . . . some data which may be sufficient to call for a reexamination of the denial of waiver" but argues that the company "has not submitted that data to the Commission as required by the Natural Gas Act." The Commission suggests that "[i]f Panhandle believes that it has sufficient cause to be granted a waiver, then it should request the Commission to grant such a waiver in the first instance."[109]

We think Panhandle's application for rehearing made it sufficiently clear that it was seeking a waiver of pertinent regulations. Furthermore, we believe the Commission had the relevant data before it to rule on the request.

Although we agree with the Commission that accepting rate decreases generally does not compel it to accept related rate increases, we think that on the facts of the disputed order, it was an abuse of discretion not to allow Panhandle to pass on its costs. Due to the location of delivery points, it appears that Panhandle makes no charge to Northern for its services. In seeking the rate increase, Panhandle was merely attempting to pass on dollar for dollar rate increases approved by the Commission for upstream pipelines. The Commission has authority to waive requirements of tracking authority in a proper case. We think that where a pipeline is merely an accounting conduit for charges made by other pipelines, good cause exists to grant a waiver.

For these reasons, we set aside that portion of the Commission's order denying Panhandle's rate increase in FERC Docket No. RP78–39, and remand the case for further proceedings consistent with this opinion. Since it appears that Panhandle does not object to the Commission's acceptance of the pipeline's rate decrease in FERC Docket No. RP78–40—except to the extent that it demonstrates discriminatory treatment—that portion of the order is affirmed.[110]

### III. CONCLUSION

In sum, we find that the Commission's rather novel revenue crediting procedure must be disapproved in this context because it is not authorized by section 7(e), it is violative of the Commission's accounting regulations, it is not supported by soundly

---

nues. *Id.* at 409–11, 574 F.2d at 620–22. The decision may cast a shadow on the Commission's revenue crediting procedure in No. 78–1356, but it does not mandate adoption of a general transportation tracking provision by FERC.

**108.** Brief of Petitioner at 26, 48–52.

**109.** Brief for Respondent at 53–55.

**110.** Judge Wright suggests that by approving Commission waivers of tracking and cost-of-service-hearing requirements we "silently admit[ ] that alterations in rates may be made outside of § 4 and § 5 proceedings." Concur-

ring and Dissenting Opinion at —— n.19 of 198 U.S.App.D.C., at 1145 n.19 of 613 F.2d. ·This, he argues, is inconsistent with our holding in No. 78–1356 that § 7 does not authorize adjustment of rates for services not before the Commission in the relevant certificate proceeding. We do not think the dispositions inconsistent. No. 78–1356 involves the Commission's attempt *under § 7* to adjust rates for services not before it; No. 78–1630 involves the propriety of *the Commission's exercise of its uncontested power to waive the cost-of-service-showing requirement in accepting new rate filings*, absent tracking authority.

based findings in the record and it is unreasonable. We therefore vacate the order in No. 78–1356 and remand the case for further proceedings consistent with this opinion. Because we invalidate the revenue crediting approach in No. 78–1356, we find the issues in No. 78–1960 largely mooted; to the extent they are not, we affirm the Commission's disposition. Finally, we vacate that portion of the order in No. 78–1630 prohibiting Panhandle to pass on its increased costs, affirm that portion approving Panhandle's filing of decreased rates, and remand the case for further proceedings consistent with this opinion.

J. SKELLY WRIGHT, Chief Judge, concurring in part and dissenting in part:

Panhandle Eastern Pipeline Company (Panhandle) challenges certain orders of the Federal Energy Regulatory Commission (FERC) relating to costs and revenues associated with the transportation of natural gas.[1] The first order, in No. 78–1356,[2] requires that Panhandle flow through[3] to its resale gas customers the revenue it will gain from transporting natural gas for another company by crediting that revenue to its "purchased gas account." The second, in No. 78–1960,[4] denies Panhandle the right to flow through the cost of obtaining transportation services from other pipelines. The remaining orders, in No. 78–1630,[5] require Panhandle to absorb increased costs but allow it to flow through savings from decreased charges associated with certain transportation contracts. In these contracts Panhandle serves as a mere accounting conduit between other pipelines. The

majority vacates the first order, affirms the second, vacates the portion of the third requiring Panhandle to absorb increased costs, and affirms the remainder of the third.

I join in the majority's disposition of the third order. As indicated in the majority opinion, in neither the order nor its brief does FERC provide any real justification for its decision to waive the requirement of tracking authority for rate decreases, but not for rate increases. Indeed, it seems to me that the Government admits the justice of Panhandle's claim when it says:

Although [Panhandle] has now set forth in its brief here some data which may be sufficient to call for a reexamination of the denial of a waiver, it has not submitted that data to the Commission as required by the Natural Gas Act. * * If Panhandle believes that it has sufficient cause to be granted a waiver, then it should request the Commission to grant such a waiver in the first instance. * *

Brief for respondent at 54–55 (citations omitted). According to the working papers, Panhandle *did* present to FERC at the time of its requested waiver all the data it now presents to this court. I therefore consider it appropriate to grant Panhandle relief from the onerous decision of the Commission without further procedural complication. In joining the majority on this point, however, I would emphasize that my agreement is limited to cases in which the pipeline involved is merely an accounting con-

1. The petitions for review were filed pursuant to § 19(b) of the Natural Gas Act, 15 U.S.C. § 717r (1976).

2. *Panhandle Eastern Pipe Line Co.*, Docket No. CP77–479 (Dec. 16, 1977), *reprinted in* Joint Appendix (JA) at 50–62, *modified* (Feb. 22, 1978), *reprinted in* JA 68–71.

3. The awkward term "to flow through" is used to denote an accounting method that permits a particular item of cost or revenue to be charged or credited to a company's customers directly; the procedure is in contrast to the usual ratemaking procedure, in which changes in cost or revenue merely affect the setting of the pro-

spective rate after the next ratemaking proceeding.

4. *Trunkline Gas Co.*, Docket No. CP78–43 (April 17, 1978), *reprinted in* JA 119–126, *rehearing denied* (Sept. 25, 1978), *reprinted in* JA 135–139.

5. *Panhandle Eastern Pipe Line Co.*, Docket Nos. RP78–39 and RP78–40 (March 10, 1978), *reprinted in* JA 91–92, *rehearing denied* (May 9, 1978), *reprinted in* JA 99–103. These orders will be referred to collectively as "the third order."

duit.[6] Where the pipeline actually makes a charge for providing transportation services, I believe a different case would be presented.

In the remainder of this opinion I shall discuss only the first two orders.[7]

## I

## A

The orders under review represent an attempt by FERC to accommodate the changing economics of natural gas pipeline operation to the provisions of the Natural Gas Act of 1938, 52 Stat. 821, 15 U.S.C. §§ 717–717z (1976 & Supp. I 1977) (as amended). It is therefore necessary to review briefly the features of the Act and the general problem faced by the Commission in its application today.

We are primarily concerned with three sections of the Act, Sections 4, 5, and 7. Section 7, 15 U.S.C. § 717f, is the provision for initial rate review. It requires all "natural gas companies," a term which encompasses interstate natural gas pipelines,[8] to obtain a "certificate of public convenience and necessity" from the Commission before offering new services. This certificate may be granted subject to "such reasonable terms and conditions as the public convenience and necessity may require." Section 7(e), 15 U.S.C. § 717f(e). FERC will commonly condition the certificate upon a rate lower than the contract rate,[9] or upon a

contingent refund obligation.[10] Temporary certificates may be issued in emergencies without notice or hearing pursuant to Section 7(c); permanent certificates, issued pursuant to Section 7(e), require notice and hearing unless the parties waive their right to a hearing.

Once rates for a pipeline are set, they may be changed at the instigation of the pipeline company or the Commission.[11] The pipeline company may obtain a rate increase by filing a new rate schedule 30 days in advance of its taking effect, pursuant to Section 4, 15 U.S.C. § 717c. The Commission, by acting within the 30 days, may suspend the new rates for a five-month period. If a hearing on the new rates is not completed within the five months, the new rates may be put into effect, subject to the obligation of the pipeline company to refund the excess if the Commission subsequently determines the rates to be above the just and reasonable rate. The burden is on the company to prove the justice and reasonableness of the new rates. Section 4(d)–(e).

If at any time the Commission suspects that the current rates charged by a pipeline company are above the just and reasonable level, it may order a hearing pursuant to Section 5, 15 U.S.C. § 717d. After the hearing the Commission may determine the just and reasonable rate and order the company to conform to it.[12]

---

**6.** Panhandle's "accounting conduit" status arises from arrangements between it and four other pipelines. An explanation of one of the deals will suffice. In it, Panhandle delivers gas to Northern Natural Gas Company at a point of intersection between the two pipelines. Panhandle in turn receives gas from Trunkline Gas Company (and indirectly from two other pipeline companies as well) at a point of intersection *downstream* from the first point. Thus the entire fee charged by Panhandle to Northern is remitted to Trunkline; no part of the cost of transportation is attributable to Panhandle's operations. *See* brief for petitioner at 49–50. FERC's decision in Docket No. RP78–11 (Dec. 1, 1977) to increase the transportation fees payable to Trunkline, coupled with its refusal in the order now under review to permit Panhandle to increase the fees payable by Northern,

thus constitutes an inexplicable penalty imposed on Panhandle in favor of Northern.

**7.** *See also* note 19 *infra.*

**8.** 15 U.S.C. § 717a(b) (1976).

**9.** *See Atlantic Refining Co. v. Public Service Comm'n,* 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 312 (1959).

**10.** *See FPC v. Sunray DX Oil Co.,* 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968).

**11.** Other affected parties may instigate a rate change by petitioning the Commission. 15 U.S.C. § 717d (1976).

**12.** FERC has no authority under § 5 to *increase* the company's rates, unless the company has filed a new rate schedule. 15 U.S.C. § 717d (1976).

Rapid changes in natural gas costs occurring over short periods of time—resulting primarily from the much-lamented "energy crisis"—have induced the Commission to make adaptations in the statutory procedures. The primary instance of such adaptation concerns the treatment of changes in the cost of natural gas itself. As explained in Order No. 452, 47 FPC 1049 (1972), *modified*, Order No. 452–A, 47 FPC 1510 (1972), *amended*, Order No. 452–B, 49 FPC 84 (1973), the Commission recognizes that the cost of purchased gas is, for most natural gas companies, the largest single component of their cost of service. In a time of rising gas costs, pipeline companies seek a form of "tracking" provision which enables them to flow through the increased gas cost to their customers automatically. If unable to obtain "tracking" authority, pipeline companies must file frequent rate increases pursuant to Section 4. Such increased filings are burdensome to both the Commission and the companies. They produce a backlog of rate filings for FERC to review, thus prolonging and delaying the administrative process. Moreover, the contingent refund obligations of natural gas companies pursuant to Section 4(e) swell, and may lead to extensive and unpredictable shifts in natural gas rates charged to consumers.

Responding to this problem, FERC adopted a procedure called a "purchased gas cost adjustment provision." *Id.*; *see* 18 C.F.R. § 154.38(d)(4) (1979). The essential purpose of the provision is to obviate the need for natural gas companies to resort to cumbersome Section 4 proceedings. It permits them to alter their rates in response to changes in the cost of their purchased gas, without full reexamination of cost-of-service data. In effect the rate is adjusted in response to changes in one variable—the cost of purchased gas—with all other components of cost-of-service assumed to remain constant.

The mechanism for this adjustment is called the "unrecovered purchased gas cost account," numbered Account 191, *see* 18 C.F.R. Part 201 (1979). Increases or decreases in purchased gas costs are registered in the account. Every six months the

company's rates are adjusted, so that over the next six-month period the revenue shortfall or excess will be amortized to zero. Thus, if the purchased gas cost of the company increases, the amount of that increase will be recorded in Account 191; at the end of the six-month period the rates will be surcharged an amount sufficient to restore the company's net revenues to the level prevailing before the cost increase. Conversely, if the purchased gas cost declines, then natural gas consumers will receive a compensating decrease in their rates during the succeeding six-month period. These changes require no examination of the underlying cost-of-service of the company. The public is protected, however, by the requirement that cost decreases as well as increases be reflected in the purchased gas account, and by periodic (every 36 months) review by the Commission of the company's total cost of service and the effect of the purchased gas account.

The natural gas industry has recently undergone another change in conditions that again may require an adaptation of FERC's procedures. As a result of the natural gas shortages starting in the first part of the 1970's, many natural gas pipelines have had to obtain new sources of gas, often not connected to their established pipelines. Accordingly, it has become common for one natural gas company to transport gas for another from the gas producer to the other company's established pipeline. Generally, this sort of arrangement entails little additional cost to the transporting company, because the shortage has left excess capacity in the pipelines. Accordingly, the costs and revenues of pipeline companies may fluctuate widely. If transporting for others, the pipeline company receives a large amount of revenue, with little attendant incremental cost. If purchasing transportation services from others, it incurs great unanticipated cost.

The orders under review reflect FERC's initial attempt to solve the problem of these cost and revenue fluctuations. As in the case of the purchased gas cost problem, the solution may be to obviate resort to the

procedures of Sections 4 and 5, lest backlogs, administrative delays, and contingent liabilities proliferate. It is not for this court to decide precisely how FERC should respond to the problem of new transportation costs and revenues;[13] we must, however, decide whether the Commission has the statutory authority to respond as it did, and whether that response is reasonable and fair. I therefore turn my attention to the orders under review.

### B

The first order concerns the treatment of revenues received by Panhandle from an agreement to transport up to 1,800 Mcf of natural gas on a firm basis and 1,200 Mcf on a best efforts basis for eventual delivery to an industrial consumer, Libby-Owens-Ford Company. Panhandle is to be paid $7,650 per month for its services.[14] Since Panhandle will be able to provide this transportation without substantial additional cost, because of its excess capacity, Panhandle will receive nearly $7,650 monthly in additional net revenues. FERC agreed to this arrangement, subject to the condition that this increase in net revenues be flowed through to the resale gas customers, by crediting the additional net revenue to Panhandle's purchased gas account. In that way the revenues could be accumulated during each six-month period, and flowed through during the next, without any party being required to resort to the cumbersome procedures for rate changes set up in Sections 4 and 5 of the Act.

The majority declares this procedure illegitimate, suspecting it of being an under-the-cover way for FERC to lower the just and reasonable rates established in a full

Section 4 ratemaking proceeding. I, however, cannot view this procedure as altering in any way the results of that earlier proceeding. All the Commission has attempted to do is to govern the use of revenues generated from a new service. As I will explain in more detail below,[15] I believe the Commission's Section 7 power to condition a certificate of public convenience and necessity is ample to support an order of this kind.

The second order concerns the treatment of transportation charges incurred by Panhandle in connection with a new agreement between Panhandle and three other pipelines. Panhandle pays the others an estimated $1.5 to $2 million per year to transport natural gas from offshore Louisiana to Panhandle's line in the Midwest; the company therefore petitioned FERC for permission to include the new transportation costs in the purchased gas account, which would enable it to flow the newly-incurred costs directly through to its customers. FERC denied this petition, in effect ruling that Panhandle must absorb the increased cost until such time as its rates are revised in a Section 4 proceeding.

Panhandle contends that this treatment of new transportation costs is inconsistent with FERC's treatment of new transportation revenues in the first order. The majority apparently agrees with this contention, but finds it unnecessary to reverse the second order because the inconsistency is removed by the reversal of the first order. The majority concludes:

> It probably would be wise for the Commission to adopt a mechanism in appropriate proceedings allowing transportation costs similar treatment to that of

---

**13.** No one can doubt that FERC has the power to adopt procedures it deems most efficient in effectuating the purposes of the Act. As the Supreme Court has emphasized, the Act does not prescribe a "rate-changing 'procedure,'" *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 342, 76 S.Ct. 373, 100 L.Ed. 373 (1956). Rather, the Act "defin[es] and implement[s] the powers of the Commission to review rates set initially by natural gas companies * * *." *Id.* at 343, 76 S.Ct. at 380. So long as FERC performs its responsibility to

review rates searchingly in the public interest, within the authority delegated by the Act, and in accordance with its own regulations and precedent, this court should not dictate a particular form or procedure.

**14.** This rate was approved by FERC, *Panhandle Eastern Pipe Line Co.*, Docket No. CP77–479 (Dec. 16, 1977), *reprinted in* JA 50–62.

**15.** *See* Part III *infra.*

purchased gas costs, but we do not think it arbitrary for the Commission to refuse to expand the definition of purchased gas costs to benefit Panhandle in a section 7 certificate proceeding for Trunkline. * *

Majority opinion, 198 U.S.App.D.C. ——, 613 F.2d 1139. I agree with this conclusion insofar as it recognizes the Commission's authority to adopt whatever reasonable procedures it deems necessary to deal with new transportation costs. I am disturbed, however, at the cumulative effect of the majority's treatment of the two orders.

In my view, the Commission is fully within its powers when it seeks to provide an expeditious procedure for accounting for changes in various costs and revenues that occur between Section 4 proceedings. Neither the first nor the second order is, in itself, arbitrary, unreasonable, or in excess of the Commission's delegated power. The majority, however, would prevent the Commission in the first order from adopting an expeditious procedure for dealing with increased revenues. In the second order the majority would permit the Commission to refrain from adopting such a procedure for dealing with increased costs. By the combination of the two positions, the majority effectively prevents the Commission from adopting expeditious procedures altogether. Even though the opinion purports in dictum to endorse "tracking"[16] or, in the alternative, allowing a "cross-refund" of excess profits as determined in a later proceeding,[17] I believe its holding—that the Commission lacks statutory authority to condition Section 7 certificates on a revenue flow-through to customers—will preclude any such procedures in this case.[18] The result of the majority's approach will be to force both the Commission and the pipelines to employ the Section 4 and Section 5 procedures more frequently, even though a separate treatment of new transportation costs and revenues is legitimate and practical. This, in my judgment, is contrary to the interest of both Commission and pipeline; more important, it is contrary to the public's overriding interest in the efficient setting of just and reasonable rates.[19]

16. *See* majority op., text and notes at notes 66–68.

17. *See id.* at note 68.

18. Because we are dealing with new, previously uncertificated transportation services, it is not likely that a general transportation "tracker" adopted at a previous § 4 proceeding would be applicable on its terms to the new service. The majority implies that if a pipeline company has the foresight and foreknowledge to request and receive a transportation "tracker" that would apply to new transportation services when they are certificated, such a "tracker" would be lawful. In this I agree. But in my view a § 7 proceeding is a more logical and appropriate occasion to decide on the treatment of costs and revenues associated with a *new* service. I do not see why the lack of tracking authority for previously certificated services prevents adoption of such authority for a new service.

19. As I understand its opinion, the majority does not disagree with this statement of the usefulness of expeditious procedures to accommodate cost and revenue fluctuations between § 4 proceedings. We disagree primarily on the issue of the scope of FERC's statutory authority to make the necessary accommodations. The majority's restrictive view, however, has produced several inconsistencies.

First, the majority appears to endorse the "purchased gas cost adjustment provision" of 18 C.F.R. § 154.38(d)(4) (1978). *See* majority op., text and notes at notes 69–86. Yet this provision serves to increase rates without a § 4 proceeding, or to decrease rates without a § 5 proceeding; thus it would seem to be impermissible under the majority's analysis. Admittedly, a purchased gas adjustment clause is established pursuant to a § 4 proceeding, but the majority does not explain where the Commission derives its authority to alter the statutory scheme—as the majority sees it—in the course of a § 4 proceeding, any more than it may do so in a § 7 proceeding.

Second, the majority says that "the order was unreasonable because it did not allow offset of revenues by increased transportation costs." Majority op., 198 U.S.App.D.C. ——, 613 F.2d at 1137. The majority suggests that such a "netting procedure" could be "essential." *Id.,* 198 U.S.App.D.C. ——, 613 F.2d at 1138. Yet, if new revenues exceed new costs, then the rates would be lowered without resort to § 5, and without any "tracking" provision. Again, this violates the principle enunciated by the majority in its Part II–A–1. Apparently the majority intended to propound alternative holdings. If so, there ensues the anomaly that the two alternative *holdings* lead to different *results*: under one, no revenue crediting is per-

Nevertheless, as I explain in more detail below, *see* Part III *infra*, I agree that FERC has acted unreasonably in its inconsistent treatment of new transportation costs and revenues. I do not believe that FERC has suggested any acceptable explanation—in terms either of procedural differences between the two or of substantive differences—that justifies this inconsistency. I reach this conclusion not out of solicitude for the fortunes of Panhandle's shareholders, but out of a conviction that consumers in the long run will be better off when rules are adopted that will lead to effective setting of just and reasonable rates. Any procedure that induces a regulated party to turn to complicated and costly procedures when simple and inexpensive ones will do, and any procedure that induces regulated parties to avoid transactions beneficial to the public because of unreasonable treatment at the hands of the Commission, will ill serve the public interest.

I would therefore hold that the orders in Nos. 78–1356 and 78–1960 be vacated and remanded to the Commission to give the Commission the opportunity to select, in the light of its experience and expertise, a fair and expeditious procedure for accounting for new transportation costs and revenues. I believe the Commission, and not this court, is in the best position to make this judgment. On remand, however, the Commission must bear in mind its obligation to deal evenhandedly with the parties; accordingly, the Commission must devise a method for treating parallel costs and revenues in the same manner, so far as possible.

## II

### A

The majority rightly recognizes that the "actual language of Section 7(e) is broad indeed," majority opinion, 198 U.S.App. D.C. at ——, 613 F.2d at 1128, but it contends that the Section 7 power falls short of that required to order a revenue flow-through in the first order under review. The majority reaches this conclusion primarily because of a mischaracterization of the FERC order. The majority treats the order as if it were one "adjusting previously approved rates for services not before the Commission in the relevant certificate proceeding." *Id.* This it is not. *Rates* are not adjusted; only the size of future rate changes via the purchased gas account is affected. The Commission has not reevaluated Panhandle's cost of service, nor has it, as the majority implies, used the Section 7 conditioning power as a vehicle for lowering Panhandle's otherwise applicable rate of return. *All* that the first order accomplishes is to require Panhandle to dispose of *new* revenues in a particular way—*i. e.*, to flow those revenues through to its resale customers. Admittedly, those customers are better off than before the order. Panhandle, however, is *neither better off nor worse off* than before. The effect of the order is to leave Panhandle's rate of return at exactly the same level as before the order.

This is the classic situation in which the Commission employs the Section 7 conditioning power—to "hold the line," or maintain the *status quo*—until a full cost-of-service proceeding is completed.[20] If FERC

mitted at all, while under the other, such crediting is permitted subject to a cost offset.

Finally, the majority's disposition of the third order, *see id.*, 198 U.S.App.D.C. at ——, 613 F.2d at 1140, conflicts with the analysis of the first order. In the third order the majority permits FERC to alter rates without a cost-of-service proceeding, in the absence of tracking authority. By affirming the Commission's decision to waive tracking authority in the third order, the majority silently admits that alterations in rates may be made outside of § 4 or § 5 proceedings.

I believe the majority's endorsement—implied or otherwise—of the purchased gas ad-

justment provisions, offset of new transportation revenues by costs, and waiver of tracking authority is commendable. But I suggest that, since the majority's restrictive interpretation of the Commission's powers is inconsistent with these and other sensible procedures, that interpretation—which in my view is a misreading of the Natural Gas Act—should be rejected. As it is, the majority's view is so pocked with exceptions as to be incomprehensible.

**20.** *See Atlantic Refining Co. v. Public Service Comm'n, supra* note 9, 360 U.S. at 392, 79 S.Ct. 1246.

were to condition a new service upon an overall lowering of the rate of return, I might have to agree that it had overstepped its authority. That is not this case.[21]

Once the majority's mischaracterization of the order is corrected, its three arguments that the Commission exceeded its Section 7 authority are quickly disposed of. First, the majority argues that the procedure adopted by FERC in this order would "emasculate the role of Section 5 in the ratemaking scheme," *id.,* 198 U.S.App.D.C. at ——, 613 F.2d at 1129, by enabling FERC to lower a pipeline company's rates by attaching conditions to new certificates. Second, it argues that the procedure erodes the protections against "regulatory lag" and "rate instability," *id.,* 198 U.S.App.D.C. at ——, 613 F.2d at 1129, by exposing pipeline companies to unexpected rate reductions. Third, it argues that the procedure circumvents the Section 5 requirements of a hearing and findings of justness and reasonableness of rates, *id.,* 198 U.S. App.D.C. at ——, 613 F.2d at 1130.

These three are merely restatements of the one argument—that the Commission used its Section 7 power to lower the rates on Panhandle's other services. The answer is the same: the underlying cost-of-service and rate-of-return determinations are unchanged by the order; only the disposition of *new* revenues is affected. Unless the majority seeks to prevent *all* rate adjustments between Section 4 or Section 5 proceedings, including tracking clauses, purchased gas adjustment clauses, and the like, there is no reason to deny FERC the authority to maintain the *status quo* by flowing new revenues through to the pipeline customers.

Most of the precedent concerning the scope of the Section 7 conditioning power concerns the setting of rates or contract terms for the certified service, as the majority observes. *See* majority opinion, text and notes at note 60. But there is no hint

in those cases that the conditioning power is *limited* to the setting of rates for certificated services. Indeed, such a holding is precluded by the very language of the Act: "The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." Section 7(e), 15 U.S.C. § 717f(e) (1976). The order requiring Panhandle to flow its new transportation revenues through to its customers falls squarely within the apparent meaning of the statutory language. The burden is on the majority to show why the order exceeded that language; the fact that previous cases have concerned a different type of condition avails little.

The majority assumes that the revenue flow-through requirement here imposed would have been permissible pursuant to a Section 4 proceeding, but that for some reason it could not be imposed in a Section 7 proceeding. *See* majority opinion, 198 U.S.App.D.C. at ——, 613 F.2d at 1133. This misconceives the differences between the two sections. Section 4 has no magical property that affords the Commission greater powers than it otherwise would have. Rather, the main difference between the sections is that Section 4 is the mechanism for evaluating changes in the costs associated with already certificated services, while Section 7 provides the mechanism for pricing and conditioning new services. Under Section 7 FERC has ample authority to ensure that certification of a new service—such as transportation— does not create an imbalance in the pipeline company's overall profit structure.

### B

The majority also accepts Panhandle's argument that the first order under review violates the Commission's regulations. This argument is based on the name and description of Account 191, the account for "unre-

---

21. Strictly speaking, this case does not even involve a lowering of rates. The revenue flow-through requirement will merely reduce the size of the purchased gas account surcharge in the next period. So long as new transportation revenues minus new transportation costs are smaller than the increase in gas costs, the rates to the consumer will continue to increase.

covered purchased gas costs." This account has been described above;[22] needless to say, the majority is correct when it concludes that the name and description of the account refer to "*costs,* not *revenues,* and to *purchased gas* items, not *transportation* items." Majority opinion, 198 U.S.App. D.C. at ——, 613 F.2d at 1135 (emphasis in original). There is no question but that the original purpose of the account was to accommodate changes in the cost of purchased gas. The existence of Account 489, entitled "Revenues from Transportation of Gas for Others," bolsters the majority's argument. The implication is that new transportation revenues belong in Account 489, not Account 191.

Admittedly, the name of the account is inapt and the description incomplete; but this does not constitute a violation of the regulations. The fact that certain items are required by regulation to be included in Account 191 does not imply that the Commission may not also use that account for other items. There is no FERC regulation that *forbids* the practice adopted by the Commission in this order. Indeed, in decisions promulgated after the order under review here (and consequently no direct support for the Commission's position in this case), FERC adopted new regulations requiring the crediting of new transportation revenues to Account 191. 44 Fed. Reg. 52185 (1979) (amending 18 C.F.R. § 284.-103); *id.* at 30329–30330 (amending 18 C.F.R. § 284.205(b)).

Looking behind the names on the accounts reveals that Account 191 is more appropriate than Account 489 in these circumstances: the latter is an ordinary revenue account, which does not provide for flowing through revenue, while Account 191 is precisely designed to serve the purposes of accommodating changes in costs and revenues on a six-month basis. Perhaps the names and descriptions of the accounts should be changed, but this court should not mistake clumsy agency nomenclature for unlawful agency action.

### C

The majority also sets aside the Commission's first order because it was not based on "an express finding that Panhandle's rates continued to recover its full cost of service." Majority opinion, 198 U.S.App. D.C. at ——, 613 F.2d at 1136. According to the majority, such an express finding is necessary before the Commission might order the new transportation revenues to be flowed through to Panhandle's customers, because otherwise the company might be deprived of a just and reasonable rate of return. The majority misconceives the nature of the Commission's assumptions.

In deciding to require the revenue flow-through, FERC did not, impliedly or otherwise, determine that Panhandle's revenues are still adequate to meet its cost of service, which was last determined in 1975.[23] Rather, it chose—properly, in my judgment—to leave reevaluation of the cost of service to the next Section 4 proceeding.[24] Panhandle has no more right to *increase* its rate of return by keeping new transportation revenues—without resorting to Section 4—than FERC has to *decrease* the rate of return using its Section 7 powers. *See* 198 U.S. App.D.C. ——–——, 613 F.2d at 1126–1127, *supra.* Operating on an analogy to the purchased gas adjustment procedure,

---

**22.** *See* text and notes at notes 12–13 *supra.*

**23.** Panhandle's rates were last set by settlement agreement in *Panhandle Eastern Pipe Line Co.,* Docket No. RP75–102 (April 25, 1977). Until they are revised, the Commission may operate as if they were still accurate. The general rate level for Panhandle is the subject of a proceeding now under way in Docket No. RP78–62.

**24.** *Cf. California Oil Co. v. FPC,* 315 F.2d 652, 655 (10th Cir. 1963):

At the outset, we must recognize and emphasize that this involves the issuance of a certificate of public convenience and necessity under Section 7(e) of the Act. It is not a "rate" case under either Section 4 or Section 5 and, therefore, the complex and intricate problems as to what is a "just and reasonable" price under those sections are not before us. We have only to determine the issue of the validity of the price condition imposed upon the certificate issued to petitioner.

the Commission decided that new transportation revenues should be credited immediately, without the delay of a Section 4 proceeding. There is nothing arbitrary or unreasonable in using this sort of interim tracking mechanism; there is, therefore, no reason to set aside the order for failure to make express findings on Panhandle's cost of service.[25]

### III

Although the order requiring flow-through of new transportation revenues thus appears unobjectionable when viewed by itself, I cannot vote to affirm it in the light of the Commission's second order, which denied Panhandle's request to flow through parallel transportation costs. Admittedly, nothing in the Act or the regulations promulgated thereunder requires FERC to approve flow-through procedures for increased costs of any sort, any more than they require FERC to approve flow-through procedures for increased revenues.[26] The Commission, however, has insisted upon a flow-through of new revenues from transportation services, and therefore assumes the burden of explaining why it treats revenues differently from parallel costs. I have searched through the orders and the brief of the Commission for an adequate explanation; finding none, I conclude that both orders must be vacated and remanded to the Commission for consistent treatment.

The Commission has not suggested any technical distinctions between new transportation costs and revenues that would justify their opposite treatment. Presumably, the data on which to base the decisions are of the same sort. It would seem that new transportation costs bear the same relationship to new transportation revenues that increases in purchased gas costs bear to decreases in purchased gas costs. The Commission adopted evenhanded treatment of the purchased gas costs; it suggests no plausible reason why evenhanded treatment of new transportation costs and revenues is not desirable as well.

The Commission's sole explanation why transportation revenues, but not costs, should be credited to the purchased gas account is:

> The purpose of the [revenue crediting] condition was to assure that the pipelines' customers share in the revenues received from such transportation service, since the rates that the customers pay are based on costs and revenues established in the pipelines' most recent approved rate case. The nonrecurring short term transportation services enable the company to retain revenues attributable to these volumes, absent the Commission's recently imposed crediting conditions. Furthermore, including transportation costs under PGA provisions is not permitted unless the pipeline has an approved "tracking" provision in its tariff. * *[27]

That, of course, is no explanation at all. If Panhandle's customers should receive the benefits accruing from their shares of the fixed costs, then they should also bear the costs incurred in obtaining additional benefits. When the Commission adopts a flexible approach to accounting for revenues, it

---

**25.** Panhandle also claims that the first order is inconsistent with the decision in *Northwest Pipeline Corp.,* Docket No. RP72–154 *et al.* (March 31, 1978). In that decision Northwest Pipeline Corporation's rates were increased pursuant to a purchased gas adjustment clause. Southwest Gas Corporation intervened in the proceeding for the purpose of requesting that Northwest be required to flow through transportation revenues via the purchased gas account. FERC rejected this request, noting that treatment of transportation revenues is properly considered in the course of a § 7 or a § 4 proceeding. Obviously, that conclusion does not conflict with the decision in the first order under review here.

**26.** Panhandle makes no claim that FERC is required by statute or regulation to approve transportation cost flow-throughs, nor does the majority. *See* majority op., 198 U.S.App.D.C. at ——, 613 F.2d at 1139.

**27.** Findings and Order after Statutory Hearing Issuing Certificate of Public Convenience and Necessity[,] Granting Intervention, and Denying Petition at 5 (April 17, 1978), *reprinted at* JA 119.

may not retreat behind the lack of formal "tracking authority" when it denies parallel treatment for related costs. The Commission must indeed seek the "lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest." [28] But lower rates are not always synonymous with just and reasonable rates. I have always understood the theory of ratemaking as setting rates at a level such that revenue will be equal to cost plus a reasonable profit. Any procedure that increases cost while forbidding an increase in related revenue must necessarily deviate from that ideal.

FERC argues that the ill effects of this uneven treatment will be offset by revenue from Panhandle's increased sales of the gas being transported. According to this theory, Panhandle would benefit from the increased sales because the price of each unit of new gas sold will include a portion of the fixed costs for the entire system. Since those fixed costs are already fully allocated to existing sales, the fixed cost component of the new sales would offset the transportation losses.

FERC's theory would come true, however, only if the fixed costs per unit, multiplied by the number of new units of gas sold, were equal to the total of new transportation costs.[29] There is no reason to assume this to be true: in this case it is embarrassingly false. The price Panhandle must pay the producers for the new supplies of natural gas is 102.83 cents per Mcf; the cost of transportation by others is 58.53 cents per Mcf. Panhandle's highest charge

for gas is 118.22 cents per Mcf. Thus, far from reaping any gains from additional fixed cost charges, Panhandle will lose 43.14 cents per Mcf on these new sales—a total of $1,576,435 per year—assuming that the company incurs *no other costs* in connection with the new sales.[30]

This manner of penalizing natural gas companies for bringing new supplies of natural gas to their customers can only harm the public. In order to provide customers with the service they require, natural gas companies have had to search far for new supplies of gas, and to procure transportation from other pipelines when those new supplies are not located along established pipeline routes. The Commission has no power to force a company to pursue new gas supplies diligently; its *only inducement* to a natural gas company is to permit a fair return on investment in new supplies. The consequences of FERC's orders in this case are easily predictable: the pipeline companies will be reluctant to procure distant supplies of gas, or they will file more frequent Section 4 increases, with all the problems such frequent filings entail. Neither possibility is in the consumers' interest. It is not the job of this court to dictate what incentives the Commission should offer the natural gas companies. But it is appropriate to note that orders that are arbitrary and unexplained may harm more than the company involved; they may hurt us all.[31]

## CONCLUSION

The majority opinion leaves little alternative to the Commission but to abandon its attempt in this case to make interim adjust-

---

**28.** *Atlantic Refining Co. v. Public Service Comm'n, supra* note 9, 360 U.S. at 388, 79 S.Ct. 1246.

**29.** This assumes that the price the pipeline receives for new gas will be equal to the variable cost per unit of the new gas plus the fixed cost per unit as previously set by ratemaking. Often, however, this assumption is untrue—and the pipeline's revenue shortfall will be even more dramatic.

**30.** Application for Rehearing of Panhandle Eastern Pipe Line Company, Docket No. CP78-43, at 6, *reprinted at* JA 132 (arithmetic error corrected).

**31.** Panhandle also challenges the lack of an evidentiary hearing in the orders under review. This raises difficult questions about hearing requirements and waiver of such requirements. Given my suggested disposition of this appeal, these questions need not be resolved: on remand FERC would presumably accord the full procedural protections mandated by the statute or provided in the sound discretion of the agency.

Panhandle also has argued that the challenged orders are discriminatory. In my view, FERC has satisfactorily explained the difference in treatment accorded in the cited instances.

ments to account for new transportation costs and revenues. The order refusing to allow cost flow-through has been affirmed; the order requiring revenue flow-through has been reversed. I respectfully suggest that my alternative disposition of the two orders [32]—to vacate and remand both for consistent treatment—would leave the Commission a much wider range of options to deal with this challenging problem. It might choose—as the majority apparently would require—to treat new transportation costs and revenues like any other changing factors, and await Section 4 or Section 5 proceedings before adjusting Panhandle's rates. It might choose to adopt a procedure for immediate flow-through of new transportation costs and revenues. It might choose to distinguish between short- and long-term transportation arrangements, or between companies with and without purchased gas cost adjustment clauses. It should have wide latitude in its decision-making so that it may construct necessary safeguards for the public interest. I would insist simply that the Commission choose a procedure that treats like accounts alike. Evenhandedness we should require; all other policy choices should be left to the Commission.

---

**32.** I join in the majority's disposition of the third order. *See* text and notes at notes 5–6 *supra*.